43 F.3d 1456
 NOTICE: First Circuit Local Rule 36.2(b)6 states unpublished opinions may be cited only in related cases.
UNITED STATES, Appellee,
v.
Thomas E. BEHENNA, Defendant, Appellant.
 No. 94-1571
 United States Court of Appeals,
First Circuit.
 Jan. 5, 1995
 
 APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MASSACHUSETTS [Hon. William G. Young, U.S. District Judge ]
 Thomas E. Behenna on brief pro se.
 Donald K. Stern, United States Attorney, and Paul G. Levenson, Assistant United States Attorney, on brief for appellee.
 D.Mass.
 AFFIRMED.
 Before Selya, Circuit Judge, Campbell, Senior Circuit Judge, and Boudin, Circuit Judge.
 Per Curiam.
 
 
 1
 This is an appeal from the district court's judgment denying the motion of appellant Thomas E. Behenna to withdraw his guilty plea. Behenna pleaded guilty to a three-count information charging him with making false statements to Dime Savings Bank of New York ("Dime New York") in violation of 18 U.S.C. Sec. 1014.
 
 I.BACKGROUND
 
 2
 In 1987, Charles McCormick, a client of Behenna (who is an attorney), told Behenna about a chance to purchase condominium units at two condominium developments, Hawthorne Village in North Attleboro and Queens Court in Plainview, Massachusetts. Behenna was informed that these units could be purchased with almost no money down. Further, the developer of Hawthorne Village, David Burns, told Behenna and other purchasers that Burns would give them a 10 percent second mortgage and a 10 percent "discount."
 
 
 3
 Arrangements were made to have Dime New York, a federally insured bank, provide the financing through its "Impact" loan program. Under this program, purchasers of residential real estate making cash down payments of 20 percent of the purchase price received loan approval prior to the receipt of documents verifying financial and other information contained in their loan applications. Dime New York's wholly owned subsidiary, Dime Real Estate Services of Massachusetts ("Dime Mass."), processed the Impact loan applications in Massachusetts; Eric Peach was the sales representative who handled the loans in question.
 
 
 4
 Behenna and the other purchasers of the condominiums were informed that instead of cash, they could use the 10 percent discount and the 10 percent second mortgage as the down payment. Nonetheless, Behenna's loan applications stated that cash down payments had been made and his purchase and sale ("P & S") agreements also erroneously reflected the presence of 20 percent cash down payments. According to Behenna, Peach was aware of the true terms of the financing and told him (Behenna) that Dime New York approved of this type of financing. In addition, Behenna prepared addenda to the P & S agreements which revealed that the second mortgages and the discounts were the sources of the down payments. Behenna gave the agreements with the addenda to Peach.
 
 
 5
 After the loan applications were approved, the closings took place at the office of Dime's closing attorney, Alan Segal. At this time, Behenna signed Fannie Mae affidavits and HUD-1 settlement statements indicating that he had made 20 percent cash down payments.[1] The HUD-1 forms stated that there was no secondary financing in connection with the purchases and, in the same vein, the Fannie Mae affidavits failed to disclose the second mortgages and the discounts. Finally, Behenna was aware, at this time, that the addenda were no longer attached to the P & S agreements.
 
 
 6
 Eventually, the Federal Bureau of Investigation conducted an investigation into Dime New York's allegations of fraud in connection with these loans. At this time, Behenna met with government personnel. According to Behenna, he was told that Dime New York had never authorized a no money down loan program, that it was unaware of the second mortgages and that it did not have in its files the addenda to Behenna's P & S agreements. After Behenna learned that he was about to be indicted on charges of bank fraud, conspiracy and making false statements to a federally insured bank, he decided to plead guilty. In return for his cooperation with the government, the government agreed to limit the charges to the making of false statements. During these discussions and in the subsequent district court proceedings, Behenna was represented by counsel.
 
 
 7
 At his change of plea hearing, Behenna stated that he knew when he signed the Fannie Mae affidavits and the HUD-1 settlement statements that they contained false information. Pursuant to the plea agreement and prior to sentencing, Behenna testified as a witness for the prosecution in the trial of Segal, Dime's closing attorney, and Robert Kline, an attorney for the developer of the condominiums at Hawthorne Village. At the end of trial, the court granted Segal's and Kline's motions for directed verdicts. One and a half months later, Behenna filed the motion to withdraw his guilty plea.
 
 
 8
 Behenna's main argument was that his false statements were not material because the Segal-Kline trial evidence showed that the bank management connived in the scheme. The district court invited briefs on the standard of materiality under the statute. Ultimately, the district court said that materiality should be evaluated on an objective basis and the court denied the motion to withdraw the plea. This appeal followed.
 
 II.THE LAW
 A. Fed. R. Crim. P. 32(d) Standards
 
 9
 Before sentencing, a defendant may move to withdraw his or her guilty plea upon a showing of a "fair and just reason." Fed. R. Crim. P. 32(d); see United States v. Parrilla-Tirado, 22 F.3d 368, 371 (1st Cir. 1994); United States v. Kobrosky, 711 F.2d 449, 454 (1st Cir. 1983). Although the standard in this situation is a liberal one, "[a] defendant possesses no absolute right to withdraw a guilty plea...." Kobrosky, 711 F.2d at 454; United States v. Ramos, 810 F.2d 308, 311 (1st Cir. 1987). "[T]his court will not set aside the district court's findings unless a defendant unequivocally shows an abuse of discretion." Ramos, 810 F.2d at 311. The factors we consider include:
 
 
 10
 (1) the plausibility of the reasons prompting the requested change of plea; (2) the timing of the defendant's motion; (3) the existence or nonexistence of an assertion of innocence; and (4) whether, when viewed in light of emergent circumstances, the defendant's plea appropriately may be characterized as involuntary, in derogation of the requirements imposed by Fed. R. Crim. P. 11, or otherwise legally suspect....
 
 
 11
 Parrilla-Tirado, 22 F.3d at 371 (footnote and citations omitted).
 
 B. Section 1014
 
 12
 Section 1014 prohibits persons from "knowingly make[ing] any false statement or report ... for the purpose of influencing in any way the action of ... any institution the accounts of which are insured by the Federal Deposit Insurance Corporation ... upon any application ... or loan...." To convict a defendant under Sec. 1014, the government must prove that
 
 
 13
 (i) the defendant made or caused to be made a false statement or report to a bank upon an application, commitment or loan, and that the false statement concerned a material fact; (ii) that the defendant acted knowingly; (iii) that the false statement or report was made for the purpose of influencing in any way the bank's action on the loan; and (iv) that the false statement or report was made to a bank whose deposits were then [federally] insured....
 
 
 14
 United States v. Concemi, 957 F.2d 942, 951 (1st Cir. 1992).[2] "A statement concerns a material fact when it has the 'capacity to influence' the lending institution." United States v. Braverman, 522 F.2d 218, 223 (7th Cir.) (citation omitted), cert. denied, 423 U.S. 985 (1975). See United States v. Haddock, 956 F.2d 1534, 1550 (10th Cir.) (an omission in a personal financial statement is material if it "had the capacity to influence the bank's decision"), cert. denied, 113 S. Ct. 88 (1992).
 
 
 15
 Further, materiality "is not merely directed to false statements which are actually used in the decision to make a loan." United States v. Goberman, 458 F.2d 226, 229 (3d Cir. 1972) (emphasis added). That is, the government is not required to show that the lending institution actually relied on the defendant's statements in making its decision to approve a loan. Id. See Haddock, 956 F.2d at 1550 (actual reliance need not be shown to meet materiality requirement); United States v. Wilcox, 919 F.2d 109, 112 (9th Cir. 1990) ("no actual influencing need be demonstrated"); United States v. Norberg, 612 F.2d 1, 4 (1st Cir. 1979) ("[i]t is not the result of the transaction upon which the statute focuses, but the purpose"). As the court in Goberman put it:
 
 
 16
 Requiring proof of reliance on the statement by the lending institution would wreak havoc with enforcement of the provision. A successful prosecution for the violation would depend on the wholly fortuitous factor of actual reliance and not at all upon the intent of the guilty party. The obvious result would be that not all statements which could potentially harm the United States would be subject to prosecution, undermining the legitimate purpose Congress sought to achieve.
 
 
 17
 Goberman, 458 F.2d at 229.
 
 III. DISCUSSION
 
 18
 Behenna's primary argument is that he is innocent of violating Sec. 1014. Specifically, he claims that the evidence at the trial of Segal and Kline and reports of statements given to the FBI by various employees of Dime Mass. establish that the bank, in fact, had authorized the "no money down" payment loan program. He also asserts that this evidence shows that he had made full disclosure to the bank of the true terms of his financing arrangements. Behenna argues that he should be allowed to withdraw his guilty plea because the government misrepresented the true facts to him prior to his decision to plead guilty.
 
 
 19
 In a case strikingly similar to this one, the Court of Appeals for the Fifth Circuit rejected a defendant's argument that his false statements did not have the capacity to influence the lending institution because the entire institution was aware of defendant's scheme. United States v. Johnson, 585 F.2d 119, 124 (5th Cir. 1978). The court, assuming the truth of defendant's assertion concerning the extent of the lending institution's knowledge, held that "[t]he focus of the offense is on the defendant's intent rather than on the victim." Id. The court went on:
 
 
 20
 The phrase "for the purpose of influencing in any way " defines the intent required to accompany a false statement and defines it broadly. It draws under its purview not only a defendant who intends to defraud an unwitting insured institution but also a defendant who intends to cooperate with the institution in a scheme requiring him, with the institution's knowledge, to make false statements for the furtherance of the scheme. The savings and loan's awareness of the fraud is not relevant, for its existence is not inconsistent with the intent to influence which a violator of Sec. 1014 must possess. Thus, this collection of facts labeled "complicity" is not a defense to a charged violation of 18 U.S.C. Sec. 1014.
 
 
 21
 Id. See also United States v. Bush, 599 F.2d 72, 75 (5th Cir. 1979) ("[T]he words 'for the purpose of influencing' define the quality of the required intent, they do not immunize a party in duplicity with a bank officer."); United States v. Kennedy, 564 F.2d 1329, 1340 (9th Cir. 1977) (defendant was not immunized from criminal liability "merely because the bank officer was a party to the scheme"), cert. denied, 435 U.S. 944 (1978); United States v. Niro, 338 F.2d 439, 440 (2d Cir. 1964) (the court described as a "non sequitur " the argument that defendant's false statements could not have influenced the lender because the president of the lending institution had suggested the scheme). Cf. Concemi, 957 F.2d at 944-45 (one of the defendants was a loan originator for the bank); Norberg, 612 F.2d at 2 (defendant was the attorney for and a director of the bank); United States v. Sheehy, 541 F.2d 123, 124 (1st Cir. 1976) (defendant was a member of the bank's executive committee which was responsible for approving loans).
 
 
 22
 In deciding whether to allow a defendant to withdraw a guilty plea, a court ordinarily will "not decide the merits of a proffered defense by resolving factual issues that are more properly decided at trial." United States v. Allard, 926 F.2d 1237, 1242 (1st Cir. 1991). "However, when the defendant's factual allegations, even if true, fail to establish a cognizable defense, they do not provide a reason for permitting withdrawal of a plea." Id. See also Ramos, 810 F.2d at 312 (Rule 32 motion may be denied if a defendant's factual contentions do not create a recognized defense).
 
 
 23
 Based on the caselaw, it is plain that Behenna's claim of innocence must fail. Simply, the assertion that Dime New York acquiesced in the use of secondary financing and had full knowledge that borrowers often did not make cash down payments in connection with the Impact loan program does not provide a defense to the charge of making false statements under Sec. 1014. See Johnson, 585 F.2d at 124. The relevant determination for criminal liability is not dependent on whether the lender relied, or even participated in, the fraud; rather, the offense is based on the defendant's "intent to influence an action, and nothing more." Wilcox, 919 F.2d at 112.
 
 
 24
 Further, it is clear, notwithstanding Behenna's claim to the contrary, that he possessed the requisite intent. In Wilcox, defendant submitted to a savings and loan association phony vouchers stating that work on a real estate development had been completed. These vouchers were necessary to obtain the loan proceeds. Defendant asserted that the false vouchers were submitted according to instructions from the lender, that the officials of the association never indicated that their advice concerning the vouchers would lead to illegal conduct, that he had not intended to mislead the association and that although he knew that the information in the vouchers was false, the association was aware of the true circumstances.
 
 The court held:
 
 25
 Here, the submission of the false vouchers was designed to influence the disbursement of funds by the savings and loan. The filing of the documents was a prerequisite to the financial institution's payments of the defendant's claims. In fact, under the procedures adopted by [the association], the payments could not have been made unless the defendant made the false representations at issue. That defendant may have been encouraged in this scheme, or even joined in it, by one or more bank officials affords him no defense at all.
 
 
 26
 Id.
 
 
 27
 As in Wilcox, the evidence shows that Dime New York would not have made an Impact loan in the absence of a 20 percent deposit made up of the borrower's own funds. Thus, Behenna's false statements concerning the down payments were necessary prerequisites to obtaining the proceeds of the loans and the statements were made precisely for the purpose of influencing Dime New York in making its decisions regarding the loans.
 
 
 28
 Finally, one of the most significant factors in deciding whether a defendant has met his or her burden of establishing a "fair and just reason" for withdrawing a guilty plea is whether the plea is knowing and voluntary. Allard, 926 F.2d at 1243; Kobrosky, 711 F.2d at 455. In the change of plea hearing, the district court judge explained to Behenna what rights he was giving up by pleading guilty and what the maximum penalties were; he next ascertained that Behenna had discussed these matters with his attorney. The government laid out the evidence it would present at trial. Asked why he was pleading guilty, Behenna responded that the HUD-1 statements and the Fannie Mae affidavits contained false statements and that he knew this when he signed them.
 
 
 29
 Nothing in the record of the change of plea hearing indicates that Behenna "was anything other than an intelligent defendant who fully understood what he was doing and was competent voluntarily to enter [a] guilty plea." See Kobrosky, 711 F.2d at 455; Ramos, 810 F.2d at 314 (district court's compliance with Fed. R. Crim. P. 11 "weighs heavily" against a defendant). In this situation, "[w]e will not permit a defendant to turn his back on his own representations to the court merely because it would suit his convenience to do so." United States v. Pellerito, 878 F.2d 1535, 1539 (1st Cir. 1989). The plea having been given knowingly and voluntarily, we cannot say that the district court judge abused his discretion by denying Behenna's motion to withdraw his guilty plea.
 
 
 30
 Given our conclusions, we reject Behenna's claim that there was no factual basis for his guilty plea. See United States v. Webb, 433 F.2d 400, 403 (1st Cir. 1970) (where court questioned defendant about the elements of the crime and had the prosecution present the evidence it had gathered, there existed a factual basis for the plea), cert. denied, 401 U.S. 958 (1971). We also find no merit in Behenna's assertion that the government withheld exculpatory evidence in violation of Brady v. Maryland, 373 U.S. 83 (1963). Plainly, the information in the FBI reports was not exculpatory.
 
 
 31
 The judgment of the district court is affirmed.
 
 
 
 [1]
 These forms required a loan applicant to attest that the statements contained in the forms were true and accurate and warned that making false statements was a crime
 
 
 [2]
 We reject, out of hand, Behenna's argument that his statements were not made to a federally insured bank. In United States v. Brandon, 17 F.3d 409 (1st Cir.), cert. denied, 115 S. Ct. 80, 81 (1994), we held, in the context of bank fraud, that the government "does not have to show the alleged scheme was directed solely toward a particular institution; it is sufficient to show that defendant knowingly executed a fraudulent scheme that exposed a federally insured bank to a risk of loss." Here, there is no dispute that the loans in question were assigned to Dime New York